# Illinois Official Reports

## Supreme Court

***Whitaker v. Wedbush Securities, Inc.*, 2020 IL 124792**

| | |
|---|---|
| Caption in Supreme Court: | JAMES Q. WHITAKER *et al.*, Appellants, v. WEDBUSH SECURITIES, INC., Appellee. |
| Docket No. | 124792 |
| Filed | March 19, 2020 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Daniel J. Kubasiak and the Hon. John C. Griffin, Judges, presiding. |
| Judgment | Judgments reversed. <br> Cause remanded. |
| Counsel on Appeal | Steven H. Lavin, Jennifer J. Gedville, and Lindsey Z. Lampros, of Lavin & Gedville, P.C., of Highland Park, for appellants. <br><br> Jeffry M. Henderson, Robert B. Christie, Todd E. Pentecost, and Brian C. Miller, of Greenberg Traurig, LLP, of Chicago, for appellee. |

Justices                JUSTICE KILBRIDE delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Garman, Karmeier, and Theis concurred in the judgment and opinion.

Justices Neville and Michael J. Burke took no part in the decision.

## OPINION

¶ 1      In this case, we construe article 4A of the Illinois Uniform Commercial Code (UCC) (810 ILCS 5/4A-101 *et seq.* (West 2014)), to determine whether it applies to the defendant futures commission merchant. The appellate court held the defendant does not fall within the scope of article 4A because it does not meet the statute's definition of a "bank" (810 ILCS 5/4A-105(a)(2) (West 2014)). Accordingly, the appellate court affirmed the trial court's judgment denying plaintiffs a refund under article 4A for amounts lost due to unauthorized funds transfers. 2019 IL App (1st) 181455-U. For the following reasons, we reverse the appellate court's judgment and remand to the trial court for further proceedings.

¶ 2                                   BACKGROUND

¶ 3      Plaintiff James Q. Whitaker[1] was a physician residing in Georgia. He owned and controlled plaintiff Pathology Institute of Middle Georgia, P.C. In 1987, plaintiffs opened commodity futures trading accounts with Goldenberg, Hehmeyer & Company. Whitaker signed a customer agreement at that time. The plaintiffs' trading accounts were transferred to different companies over the years, first to Penson Worldwide and then to KCG Futures. Finally, in December 2014, the two trading accounts were assigned to defendant Wedbush Securities, Inc., when KCG Futures sold its futures commission merchant business to defendant.

¶ 4      Plaintiffs did not enter into a new customer or security agreement with defendant. Defendant held plaintiffs' funds in customer segregated accounts at BMO Harris Bank (BMO Harris). BMO Harris provided an online portal for defendant to process wire transfers for its customers.

¶ 5      Shortly after defendant purchased plaintiffs' trading accounts, it received several wire transfer requests by e-mail purporting to be from plaintiffs. The e-mails, however, were actually sent by a third party who had hacked Whitaker's e-mail account. After assuming control of Whitaker's e-mail account, the hacker could send wire transfer requests to defendant and intercept defendant's e-mail replies.

¶ 6      Between December 17 and December 29, 2014, the hacker sent several unauthorized e-mail requests to wire transfer funds from plaintiffs' trading accounts. Defendant rejected an initial request because it sought the transmission of funds to a third party. Later that afternoon, defendant received another e-mail requesting wire transfer of funds to an account purportedly

---

[1] Plaintiff died on October 13, 2019, and the executor of his estate, Stanley M. Smith, was substituted as the proper party for the decedent.

held by plaintiff the Pathology Institute of Middle Georgia at a bank in Poland. Defendant completed that wire transfer the next day. Defendant subsequently completed three other wire transfers to the bank in Poland after receiving requests from Whitaker's e-mail account. Defendant used the online portal to transmit each of the four wire transfer requests to BMO Harris for execution. The unauthorized wire transfers totaled $374,960.

¶ 7    On each occasion, defendant sent an e-mail to Whitaker's e-mail account acknowledging its receipt of the wire transfer request and a subsequent e-mail confirming the completed wire transfer. Defendant also e-mailed Whitaker account statements on each of the days it sent a wire transfer, but the hacker apparently intercepted those statements. On December 29, 2014, Whitaker contacted defendant after he received an account statement containing an incorrect balance. On January 12, 2015, Whitaker received account statements from defendant reflecting the unauthorized transfers that occurred in December 2014.

¶ 8    After defendant refused plaintiffs' demand for return of the transferred funds, plaintiffs filed suit in the circuit court of Cook County asserting claims of fraudulent concealment and seeking a refund of the transferred funds under article 4A of the UCC (810 ILCS 5/4A-101 *et seq.* (West 2014)). The trial court granted defendant's motion for summary judgment on the fraudulent concealment counts, leaving only plaintiffs' claims under article 4A.

¶ 9    The claims based on article 4A proceeded to a bench trial. During the bench trial, the circuit court excluded plaintiffs' exhibit No. 11, consisting of printouts of a website purporting to show that defendant's services included personal checking, savings, and lending. Following the bench trial, the circuit court entered judgment for defendant on the UCC counts, stating the evidence did not establish that defendant operated as a "bank" under the definition of that term in article 4A (810 ILCS 5/4A-105(a)(2) (West 2014)). The circuit court found it was unnecessary to consider whether defendant's actions were commercially reasonable given that defendant did not meet the definition of a bank and, therefore, was not subject to the provisions of article 4A.

¶ 10    On appeal, plaintiffs contended, in pertinent part, that the circuit court erred in denying admission of exhibit No. 11 and in holding plaintiffs were not entitled to relief under article 4A of the UCC. The appellate court held the circuit court did not abuse its discretion in excluding exhibit No. 11 because plaintiffs failed to provide proper authentication for that exhibit. 2019 IL App (1st) 181455-U, ¶ 46.

¶ 11    On the merits of the article 4A claim, the appellate court held plaintiffs failed to prove by a preponderance of the evidence that defendant was a bank, as required to establish their claim under article 4A. 2019 IL App (1st) 181455-U, ¶ 56. The appellate court observed that, in cases under articles 3 and 4 of the UCC, courts have held that offering checking services is a key factor in determining whether an entity is a bank. 2019 IL App (1st) 181455-U, ¶ 68. The admissible evidence did not indicate that defendant offered checking services to its futures commission customers. 2019 IL App (1st) 181455-U, ¶ 70. Based on the language of the UCC, its official comments, and the case law interpreting articles 3, 4, and 4A, the appellate court held it could not conclude that defendant was engaged in the business of banking. 2019 IL App (1st) 181455-U, ¶ 70. The circuit court's judgment in favor of defendant on the article 4A claims was, therefore, affirmed. 2019 IL App (1st) 181455-U, ¶ 71.

¶ 12    We allowed plaintiffs' petition for leave to appeal (Ill. S. Ct. R. 315 (eff. July 1, 2018)).

## II. ANALYSIS

¶ 14　On appeal to this court, plaintiffs contend article 4A applies to this case because defendant acted as a bank within the meaning of that term in the statute. Plaintiffs argue the appellate court construed the term "bank" much too narrowly. According to plaintiffs, defendant falls within the scope of article 4A because it is a financial institution acting on behalf of its customers in funds transfers. Plaintiffs maintain that the plain language of article 4A and the official comments establish that defendant is a bank within the meaning of the statute.

¶ 15　Defendant responds that article 4A does not apply here because it was not engaged in the business of banking. Plaintiffs failed to present any admissible evidence showing defendant offered checking services, deposit accounts, loan services, or other traditional services constituting the business of banking. Defendant argues it only acted as plaintiffs' agent by receiving wire transfer requests and forwarding them to BMO Harris Bank for processing.

¶ 16　In this appeal, we must construe article 4A to determine whether defendant qualifies as a bank within the meaning of the statute. The construction of a statute is a question of law reviewed *de novo*. *Bank of New York Mellon v. Laskowski*, 2018 IL 121995, ¶ 12. When construing a statute, our primary objective is to ascertain and give effect to the legislature's intent. *Accettura v. Vacationland, Inc.*, 2019 IL 124285, ¶ 11. The most reliable indicator of legislative intent is the statutory language, given its plain and ordinary meaning. *In re Marriage of Goesel*, 2017 IL 122046, ¶ 13. When the language of a statute is clear and unambiguous, we must apply it as written, without resort to extrinsic sources to determine legislative intent. *Raab v. Frank*, 2019 IL 124641, ¶ 18. We may not depart from the plain language of a statute by reading in exceptions, limitations, or conditions conflicting with the expressed legislative intent. *Metropolitan Life Insurance Co. v. Hamer*, 2013 IL 114234, ¶ 18. In construing the UCC, this court has also looked to the UCC official comments to discern the legislature's intent. *MidAmerica Bank, FSB v. Charter One Bank, FSB*, 232 Ill. 2d 560, 570 (2009).

¶ 17　Article 4A of the UCC was drafted in 1989 to address a dramatic increase in wholesale wire transfers between financial institutions and other commercial entities. *Choice Escrow & Land Title, LLC v. BancorpSouth Bank*, 754 F.3d 611, 616 (8th Cir. 2014). The drafters sought to create a legal framework to balance the rights and obligations between a bank and its institutional customers when completing funds transfers. *Choice Escrow & Land Title*, 754 F.3d at 616.

¶ 18　Relevant to this appeal, article 4A balances the risk involved if a third party steals a customer's identity and issues a fraudulent payment order to a bank. *Choice Escrow & Land Title*, 754 F.3d at 616. A bank is generally required to refund amounts lost through unauthorized payment orders. See 810 ILCS 5/4A-204(a) (West 2014) (requiring bank to refund payment plus interest when it accepts an unauthorized payment order). While the bank generally bears the risk in this situation, article 4A provides a means for the bank to protect itself from liability and shift the risk of loss to the customer. *Choice Escrow & Land Title*, 754 F.3d at 616-17. Specifically, under section 4A-202, the customer bears the risk of loss from an unauthorized payment order if (1) the bank and its customer have agreed to implement a commercially reasonable security procedure to protect against unauthorized payment orders and (2) the bank accepts the payment order in good faith and in compliance with the parties' security procedure and any written instructions from the customer restricting acceptance of

payment orders. 810 ILCS 5/4A-202(b) (West 2014); *Choice Escrow & Land Title*, 754 F.3d at 617.

¶ 19    The term "bank" is defined under article 4A as "a person engaged in the business of banking and includes a savings bank, savings and loan association, credit union, and trust company." 810 ILCS 5/4A-105(a)(2) (West 2014). The definition of a bank in article 4A is vague at best, relying as it does on the phrase "business of banking." Additionally, Illinois case law does not provide any specific guidance on this point. The parties agree that, prior to this case, no Illinois court has addressed what it means to be "engaged in the business of banking" under article 4A, and our research has not uncovered any Illinois decision construing the definition of the term "bank" in section 4A-105(a)(2).

¶ 20    The parties observe, however, that the Illinois UCC is based on the Uniform Commercial Code enacted by all 50 states and, therefore, decisions from other states and federal case law may be helpful in this analysis. In the absence of Illinois cases on the subject, Illinois courts have looked to UCC decisions from other jurisdictions. *Patrick v. Wix Auto Co.*, 288 Ill. App. 3d 846, 850 (1997).

¶ 21    In support of their position, plaintiffs cite federal court decisions in *Gold v. Merrill Lynch & Co.*, No. 09-318-PHX-JAT, 2009 WL 2132698 (D. Ariz. July 14, 2009), and *Covina 2000 Ventures Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 06 Civ. 15497(DLC), 2008 WL 1821738 (S.D.N.Y. Apr. 21, 2008). In *Gold*, the plaintiff opened a retirement account with defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch), a brokerage firm, prior to his marriage. The plaintiff's wife was not authorized to obtain funds from the account, but she was nevertheless allowed to withdraw more than $335,920 in five separate wire fund transfers between 2005 and January 2007. After discovering the withdrawals in January 2008, the plaintiff filed breach of contract and negligence claims against Merrill Lynch. *Gold*, 2009 WL 2132698, at *1. Merrill Lynch responded with a motion to dismiss seeking a determination that it was a bank within the meaning of article 4A, enabling it to invoke the one-year statute of repose in section 4A-505. *Gold*, 2009 WL 2132698, at *2-3.

¶ 22    The federal district court found "no compelling reason to exclude [Merrill Lynch] from the definition of a bank in Article 4A." *Gold*, 2009 WL 2132698, at *3. The court observed that the official comment to section 4A-105 states the definition of a bank "reflects the fact that many financial institutions now perform functions previously restricted to commercial banks, including acting on behalf of customers in funds transfers." (Internal quotation marks omitted.) *Gold*, 2009 WL 2132698, at *3. The court held the comment "strongly implies" that Merrill Lynch, a brokerage firm, should be considered a bank under article 4A. *Gold*, 2009 WL 2132698, at *3.

¶ 23    Merrill Lynch also sought to invoke the article 4A statute of repose in *Covina 2000 Ventures Corp.*, 2008 WL 1821738. In that case, the district court asserted that article 4A was enacted " 'to correct the perceived inadequacy of attempting to define rights and obligations in funds transfers by general principles of common law or by analogy to rights and obligations in negotiable instruments law or the law of check collection.' " *Covina 2000 Ventures Corp.*, 2008 WL 1821738, at *3 (quoting *Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 102 (2d Cir. 1998)). The district court concluded that Merrill Lynch was a bank under the facts of that case. *Covina 2000 Ventures Corp.*, 2008 WL 1821738, at *4. Consequently, the article 4A

statute of repose applied to bar the plaintiffs' claims seeking recovery of funds lost due to unauthorized wire transfers. *Covina 2000 Ventures Corp.*, 2008 WL 1821738, at *4.

¶ 24 The Second Circuit Court of Appeals affirmed the district court's judgment in *Covina*, stating, in pertinent part, that "[t]he definition of 'bank' for Article 4A purposes encompasses Merrill Lynch." *Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 88 n.3 (2d Cir. 2010). The Second Circuit observed that the definition of the term "bank" in article 4A has been construed liberally to promote the purposes and policies of the UCC. *Ma*, 597 F.3d at 88 n.3 (citing *Woods v. MONY Legacy Life Insurance Co.*, 641 N.E.2d 1070 (N.Y. 1994)).

¶ 25 Defendant, nonetheless, contends that the appellate court correctly relied on cases interpreting articles 3 and 4 of the UCC and in concluding "a key factor in the determination that an entity is a 'bank' is whether it offers checking services." 2019 IL App (1st) 181455-U, ¶ 68. Defendant argues that the definition of a bank is essentially the same in article 3 (810 ILCS 5/3-103(c) (West 2014)), article 4 (810 ILCS 5/4-105(1) (West 2014)), and article 4A (810 ILCS 5/4A-105(a)(2) (West 2014)) and that those definitions should be interpreted consistently. Defendant maintains it cannot be a bank within the meaning of article 4A because there was no admissible evidence before the trial court showing it provided its customers with checking services.

¶ 26 The article 3 and 4 cases discussed by defendant and the appellate court generally focus on the activities at issue in those cases in determining whether the defendant was engaged in the business of banking. For example, in *Borchers v. Vanguard Group, Inc.*, No. 2:08-cv-02138-REJ, 2011 WL 2690424 (D. Ariz. July 11, 2011), the plaintiffs sought to recover from defendant Vanguard Group, a mutual fund company, funds lost from wrongful disbursement of forged checks. The district court observed that courts in several states have held that non-bank financial and investment firms were engaged in the business of banking within the meaning of the UCC when they provided their customers with check-writing services. *Borchers*, 2011 WL 2690424, at *2. The district court concluded that Vanguard Group was a bank under article 4 based on the check-writing service it provided for the plaintiffs that functioned like a traditional bank checking account. *Borchers*, 2011 WL 2690424, at *3.

¶ 27 The other cases cited by defendant follow the same basic analysis, focusing on the activities at issue. See *Nisenzon v. Morgan Stanley DW, Inc.*, 546 F. Supp. 2d 213, 224-25 (E.D. Pa. 2008) (holding a brokerage firm offering checking services was a bank under the UCC); *Edward D. Jones & Co. v. Mishler*, 983 P.2d 1086, 1095 (Or. Ct. App. 1999) (holding a securities broker-dealer was a bank within the meaning of article 4 when it offered the defendant a checking account and participated in the check collection process); *Woods*, 641 N.E.2d at 1072 (holding an insurance company was engaged in the business of banking for purposes of article 4 when it administered plaintiff's money market account resembling an ordinary checking account); *Lichtenstein v. Kidder, Peabody & Co.*, 727 F. Supp. 975, 979 (W.D. Pa. 1989) (holding a brokerage firm offering checking services is considered a bank under article 4), *vacated on other grounds by* 777 F. Supp. 423 (W.D. Pa. 1991); *Asian International, Ltd. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 435 So. 2d 1058, 1062 (La. Ct. App. 1983) (holding an investment brokerage firm was a bank under the UCC because it provided its customer with a general securities and checking account).

¶ 28 The cases discussed above interpreted the definition of a bank in the context of articles 3 and 4, in light of the specific facts before them. Article 3 applies to negotiable instruments and

specifically states it does not apply to payment orders governed by article 4A. See 810 ILCS 5/3-102 (West 2014). Article 4 defines the rights of parties with respect to bank deposits and collections. 810 ILCS Ann. 5/4-101, UCC Comment 3 (Smith-Hurd 2014). The cases cited by defendant and the appellate court generally address disputes involving checking services. Accordingly, it is not surprising that they focused on that activity in determining whether a defendant was a bank within the context of articles 3 and 4.

¶ 29 Nonetheless, we do not believe those cases intended to limit the definition of a bank under the UCC strictly to institutions offering checking services. The cases do not state that an entity may not qualify as a bank under those provisions if it does not offer checking services. Indeed, in *Borchers*, the district court acknowledged that the *Gold* court held an investment firm was engaged in the business of banking under article 4A when it provided customers with wholesale wire transfer services. *Borchers*, 2011 WL 2690424, at *2. *Borchers* recognized that courts had "embraced a broad definition of a 'bank' " under the UCC. *Borchers*, 2011 WL 2690424, at *3.

¶ 30 More importantly, the language of article 4A does not support an interpretation that offering checking services is necessary to meet the definition of a bank. If the legislature had intended to limit the definition of a bank to financial institutions providing checking services, it could have easily done so. The legislature did not enact the statute with a provision requiring checking services to meet the definition of a bank, however, and we cannot add provisions or limitations not expressed by the legislature. See *Metropolitan Life Insurance Co.*, 2013 IL 114234, ¶ 18. Accordingly, we reject defendant's argument that it cannot be a bank under article 4A without evidence that it offered checking services.

¶ 31 Defendant also claims that plaintiffs seek to rewrite the definition of a bank to apply to anyone who processes a funds transfer. The appellate court expressed a similar concern, asserting that the definition of a bank in section 4A-105 would be unnecessary if the mere act of processing a wire transfer were sufficient to place a person within the scope of article 4A.

¶ 32 We find the official comments to section 4A-105 clarify that the definition of a bank operates to narrow the application of article 4A to financial institutions. See 810 ILCS Ann. 5/4A-105, UCC Comment 1, at 541 (Smith-Hurd 2014) (stating "[t]he definition reflects the fact that many financial institutions now perform functions previously restricted to commercial banks"). Thus, article 4A does not apply to every party making a funds transfer. Rather, it is confined to *financial institutions* that meet the definition of a bank in section 4-105A. The definition of a bank is not superfluous under a construction of the statute including financial institutions within its scope. See *1550 MP Road LLC v. Teamsters Local Union No. 700*, 2019 IL 123046, ¶ 31 (courts must construe statutes so that each word, clause, and sentence is given a reasonable meaning, if possible, and no part is rendered superfluous). Significantly, in the cases cited by defendants and the appellate court, different types of financial institutions, including mutual fund companies, brokerage firms, and insurance companies, were considered banks within the meaning of the UCC. See *Borchers*, 2011 WL 2690424, at *2; *Nisenzon*, 546 F. Supp. 2d at 224-25; *Woods*, 641 N.E.2d at 1072.

¶ 33 In sum, we believe the analysis in *Gold*, *Covina*, and *Ma* is persuasive when considering whether defendant is a bank within the meaning of article 4A. As in *Gold*, plaintiffs here rely on the official comment to section 4A-105. The comment states, in pertinent part, that the term "bank" "includes some institutions that are not commercial banks" and that "[t]he definition

reflects the fact that many financial institutions now perform functions previously restricted to commercial banks, including acting on behalf of customers in funds transfers." 810 ILCS Ann. 5/4A-105, UCC Comment 1, at 541 (Smith-Hurd 2014). The comment indicates that providing funds transfers is a common banking function. Article 4A, however, was intended to govern "[w]holesale wire transfers" typically involving "very large amounts of money," not consumer-based transactions involving "relatively small amounts of money and a single contract." 810 ILCS 5/4A-104, UCC Comment 2, at 537 (Smith-Hurd 2014).

¶ 34  We recognize that the definition of a bank in article 4A is certainly not precise and it must be applied based on the specific facts of a given case. We emphasize, though, that article 4A does *not* apply to every person or entity that processes a funds transfer. Contrary to defendant's argument, the definition ordinarily would not include law firms, title companies, or similar entities unless the organization may fairly be considered a financial institution providing wholesale wire transfers.

¶ 35  In this case, we conclude that the undisputed evidence shows defendant meets the definition of a bank in article 4A. As noted above, courts have consistently held mutual fund companies, brokerage firms, and insurance companies may fall within the definition of a bank under articles 3, 4, and 4A. See *Borchers*, 2011 WL 2690424, at *2; *Gold*, 2009 WL 2132698, at *3; *Nisenzon*, 546 F. Supp. 2d at 224-25; *Woods*, 641 N.E.2d at 1072. In its brief, defendant states it is a registered futures commission merchant. Prior to trial, defendant's attorney stipulated that defendant is also registered as a broker-dealer. When KCG Futures sold plaintiffs' accounts to defendant, KCG Futures sent a letter to Whitaker stating defendant was a "leading financial services company" that offered a variety of services, including brokerage and trading services. It is clear that defendant is a financial institution.

¶ 36  Additionally, the undisputed evidence shows defendant processed four unauthorized wire transfers out of plaintiffs' trading accounts over the course of less than two weeks totaling $374,960. *Cf. Gold*, 2009 WL 2132698, at *1 (brokerage firm met the definition of a bank under article 4A when it processed five separate wire fund transfers over a period of more than one year totaling $335,920). The evidence also shows defendant regularly assisted its customers in processing funds transfers. A current and a former employee both testified they processed 15 to 20 wire transfer requests per day on average. Another former employee was asked if she recalled working on any wire transfer requests to Poland, and she replied that, "[b]ecause of volume, I don't remember locations."

¶ 37  As noted, courts have construed the term "bank" in article 4A liberally to promote the purposes and policies of the UCC. *Ma*, 597 F.3d at 88 n.3 (citing *Woods*, 641 N.E.2d at 1070); see also *Borchers*, 2011 WL 2690424, at *3 (stating courts have embraced a broad definition of the term "bank" under the UCC). Based on the evidence, we conclude that defendant is a financial institution acting on behalf of its customers in funds transfers. See 810 ILCS Ann. 5/4A-105, UCC Comment 1 (Smith-Hurd 2014). Given the specific circumstances of this case, defendant meets the definition of a bank under article 4A.

¶ 38  Plaintiffs also argue that the trial court erred in excluding plaintiffs' exhibit No. 11 from evidence. The exhibit is a printout purporting to be from defendant's website that lists "banking services" provided by defendant, including personal checking, savings, and collateral loans. On appeal, the parties dispute whether plaintiff provided a proper foundation to authenticate the exhibit.

¶ 39    In this appeal, plaintiffs rely on the exhibit as evidence that defendant was engaged in the business of banking within the meaning of article 4A. Given our holding based on the admissible evidence that defendant met the definition of a bank under article 4A, we need not address whether the trial court erred in excluding plaintiffs' exhibit No. 11. See *Barth v. Reagan*, 139 Ill. 2d 399, 419 (1990) (reviewing court ordinarily will not decide issues unnecessary to the disposition of a case).

¶ 40    Finally, plaintiffs ask this court to decide the remaining issues necessary to determine if defendant is required to refund the lost amounts under article 4A, namely, whether the parties implemented a commercially reasonable security procedure and whether defendant processed the payment orders in good faith. See 810 ILCS 5/4A-202 (West 2014). Plaintiffs also ask this court to determine the amount of damages if we find that they are entitled to relief on their article 4A claims. Plaintiffs argue that the record contains sufficient evidence for this court to decide those issues now.

¶ 41    In this case, the trial court has not decided the remaining issues on the applicability of article 4A. The court's order stated, "[b]ecause defendant does not meet the definition of a bank, there is no reason to proceed to whether defendant's actions were commercial[ly] reasonable." Accordingly, a decision on those issues was not made by the trial court or reviewed on appeal to the appellate court. We believe a remand to the trial court is warranted to allow that court to make the initial decision on those issues. See *West Bend Mutual Insurance Co. v. TRRS Corp.*, 2020 IL 124690, ¶ 44.

¶ 42                                    III. CONCLUSION

¶ 43    For the above reasons, we reverse the judgments of the appellate court and the circuit court and remand to the circuit court for further proceedings.

¶ 44    Judgments reversed.

¶ 45    Cause remanded.

¶ 46    JUSTICES NEVILLE and MICHAEL J. BURKE took no part in the consideration or decision of this case.