NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (4th) 230703-U

NO. 4-23-0703

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 29, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| LORI L. QUIGG, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Morgan County |
| MOHAMMED SALEEM, REBECCA L. STOCKER, | ) | No. 22LA13 |
| and QUIGG ENGINEERING, INC., an Illinois | ) | |
| Corporation, | ) | |
|     Defendants | ) | Honorable |
| | ) | John M. Madonia, |
| (Mohammed Saleem, Defendant-Appellant). | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Lannerd and DeArmond concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court (1) affirmed the trial court's entry of summary judgment in plaintiff's favor on the issues of (a) whether defendant purchaser had defaulted under the terms of the sale documents and (b) plaintiff's ability to control and operate the company that was the subject of the sale but (2) reversed the entry of summary judgment in favor of plaintiff on the issue of her acceptance and ownership of the collateral stock in the company in satisfaction of the debt. The appellate court vacated all other findings of the trial court and remanded for further proceedings.

¶ 2   This complicated case involves deciding who is in control of an engineering company that was sold using the stock in that company as pledged collateral. The trial court determined that the purchaser defaulted on certain payment obligations and that the terms of the sale documents revested the seller with complete ownership of the shares in her possession, which she held as collateral for the sale. We affirm the trial court's finding of default and its placing the seller in control of the company under the terms of the sale documents. However, we reverse the

court's finding that the seller was automatically vested with ownership of the collateral stock because we conclude that article 9 of the Illinois Uniform Commercial Code (UCC) (810 ILCS 5/9-101 *et seq.* (West 2018)) explicitly forbids parties from contracting for such a remedy, which does not comply with the mandatory provisions for such relief under the UCC. Accordingly, we vacate the remaining findings and judgments of the trial court and remand for further proceedings consistent with this order.

¶ 3                                    I. BACKGROUND

¶ 4                    A. Summary of the Events on Which This Case Is Based

¶ 5            In January 2019, plaintiff-appellee, Lori Quigg, and defendant-appellee, Rebecca L. Stocker, entered into a stock sale agreement with defendant-appellant, Mohammed Saleem, to purchase Quigg Engineering, Inc. (QEI), for approximately $8 million. The parties agreed to use the shares of stock in QEI as collateral to finance Saleem's purchase. Quigg and Stocker issued new stock certificates in Saleem's name for all 1000 existing shares of QEI stock, and pursuant to the terms of two share pledge agreements, Saleem pledged and physically gave back 900 shares to Quigg and 100 shares to Stocker, which represented their respective percentage of ownership of QEI at the time of the sale. Saleem also executed promissory notes in favor of Quigg and Stocker for their portions of the purchase price.

¶ 6            The sale documents—consisting of (1) the stock sale agreement, (2) a promissory note to Quigg, (3) a promissory note to Stocker, (4) a pledge agreement to Quigg, and (5) a pledge agreement to Stocker—contained cross-default provisions, meaning that a default on any one of the five individual sale documents also constituted a default on the remaining four. Section 2(A) of the notes required Saleem to make regular monthly payments (section 2(A) payments), and section 2(B) of the notes required biannual "mandatory prepayments," due January 1 and July 1 of

each year, that were calculated based on the net profits of QEI for the six-month period before each mandatory prepayment (section 2(B) payments). If Saleem defaulted under the terms of the sale documents, the pledge agreements authorized Quigg and Stocker, at their election, to (1) declare all amounts under the notes immediately due in full and (2) vest in themselves all of Saleem's rights in the pledged stock in their possession. Unless and until an event of default, however, the pledge agreements gave Saleem the right to vote the shares of stock and receive any and all cash dividends.

¶ 7        In short, on January 1, 2019, Saleem became the sole owner of 100% of the shares in QEI and retained all shareholder rights, but Quigg and Stocker held physical possession of the stock and could immediately exercise all shareholder rights in the event of Saleem's default. Even after Saleem purchased the company and became its chief executive officer (CEO), Quigg and Stocker continued in their employment with QEI, Quigg as "president" and Stocker as "vice president." Saleem made all of his required section 2(A) payments, and in December 2020 and 2021, Saleem made section 2(B) payments of $200,000.

¶ 8        In June 2022, Saleem and Quigg received a notice from QEI's lender, Bank of Springfield, that Saleem had taken distributions from QEI that were several hundred thousand dollars above the amounts Bank of Springfield had authorized for QEI's operation, Saleem's tax liability, and the stock purchase payments made that year. Shortly thereafter, Quigg sent Saleem a notice of default, asserting that the unauthorized distributions constituted a default under the sale documents because those distributions (1) caused QEI to lose its operational line of credit from Bank of Springfield and (2) demonstrated that Saleem failed to make adequate section 2(B) payments in previous years. The parties and their attorneys attempted to resolve the payment and line of credit issues, but tempers flared and QEI quickly ran out of cash, jeopardizing its ability to

make payroll and perform on its government contracts.

¶ 9     On August 1, 2022, Quigg and Stocker held a meeting at which they declared themselves the owners of the pledged stock and elected themselves as the sole officers of QEI.

¶ 10     B. The Complaint and Preliminary Proceedings

¶ 11     On August 1, 2022, Quigg filed a declaratory judgment action, seeking a declaration that Saleem was in default under the terms of the sale documents and Quigg was entitled to immediate ownership and control of QEI. Quigg asserted two grounds for Saleem's default.

¶ 12     First, Quigg alleged Saleem defaulted on the Bank of Springfield line of credit by taking unauthorized distributions from QEI as cash dividends that he used for purposes unrelated to QEI's operations or his purchase of QEI's shares (the line of credit default). Second, Quigg alleged Saleem breached his obligations under section 2(B) of the note by (1) making inadequate mandatory net profit prepayments and (2) failing to provide the required financial documentation from QEI's accountant to support his net profit calculations (the section 2(B) default). Based on these two defaults, Quigg alleged that section 8 of the pledge agreement explicitly authorized her to declare all amounts due and immediately vest all of Saleem's rights relating to the collateral stock in herself.

¶ 13     Shortly after she filed the complaint, Quigg sought an emergency temporary restraining order (TRO) preventing Saleem from making any changes to QEI's operations, policies, or procedures as they existed prior to August 1, 2022. The trial court granted the TRO without notice to Saleem. Once notified, Saleem sought to dissolve the TRO based on, among other things, improper lack of notice. The trial court denied the motion to dissolve, Saleem appealed, and this court reversed. *Quigg v. Saleem*, 2022 IL App (4th) 220720, ¶¶ 15-16, 215

N.E.3d 329.

¶ 14 Later in August, Saleem filed his answer, affirmative defenses, and counterclaims. Saleem denied any default and asserted the defenses of (1) lack of notice of default and opportunity to cure, (2) waiver of Quigg's right to contest the adequacy of the section 2(B) payments by failing to object to his December 2020 and 2021 payments within 30 days (as set forth in section 2(B) of the note), and (3) failure to comply with section 9-620 of the UCC (810 ILCS 5/9-620 (West 2018)), which governs the procedure for accepting collateral in satisfaction of a debt. Count I of Saleem's counterclaim alleged breach of contract based on Quigg's failure to negotiate or execute a subordination agreement with Signature Bank, preventing QEI from obtaining a new line of credit. Count II sought declaratory relief and damages based on Quigg's failure to comply with article 9 of the UCC, specifically section 9-620. Count III sought damages for Quigg's interference with QEI's operations by wrongfully asserting ownership over the company and interfering with QEI's vendors and clients by telling them that she was the owner and attempting to prevent Saleem from accessing QEI's software and e-mails.

¶ 15 C. The Preliminary Injunction Evidentiary Hearing

¶ 16 Also in August 2022, Saleem filed a motion for a preliminary injunction to (1) maintain the status quo of Saleem's full ownership and control of QEI, (2) restrain Quigg and Stocker from interfering with QEI's operations, and (3) require Quigg to negotiate and enter into a subordination agreement to give QEI access to a new line of credit. We note that, after receiving this court's ruling reversing the TRO, Quigg voluntarily withdrew her own petition for a preliminary injunction.

¶ 17 The trial court conducted an evidentiary hearing on Saleem's motion for preliminary injunctive relief over four days in October and November 2022. The majority of the

testimony and evidence presented at that hearing addressed (1) the section 2(B) default—namely, Saleem's failure to comply with section 2(B) payments—and (2) Saleem's counterclaims based on Quigg's (a) failure to sign the subordination agreement with Signature Bank and (b) tortious interference with QEI's business operations. As we earlier explained, we do not discuss these issues because we affirm the trial court's subsequent entry of summary judgment on the issue of Saleem's default on alternate grounds.

¶ 18 Relevant to this appeal, the parties presented the following evidence at the hearing on Saleem's request for a preliminary injunction: (1) the June 16, 2022, notice of default from Quigg to Saleem; (2) testimony from Mike Halsne, an executive on the Bank of Springfield loan committee who handled QEI's accounts, regarding the terms of the Bank of Springfield line of credit and Saleem's unauthorized distributions; (3) testimony from Saleem and his wife, Samina, regarding those distributions; and (4) testimony from Quigg, Stocker, and Saleem regarding the Signature Bank subordination agreement and line of credit.

¶ 19 On January 3, 2023, the trial court entered a written order denying Saleem's request for injunctive relief. In that order, the court, in an effort to assist the parties and streamline resolution of the dispute, expressed its views on the merits of Saleem's affirmative defenses, particularly the issues of notice of default and waiver.

¶ 20 D. Quigg's Motion for Summary Judgment

¶ 21 In November 2022, before the trial court denied Saleem's request for injunctive relief, Quigg filed a motion for partial summary judgment on the issue of Saleem's default. Although Quigg's motion was based on (1) the line of credit default and (2) the section 2(B) default, a majority of her arguments addressed the section 2(B) default. Saleem filed a response in which he argued summary judgment was inappropriate because the parties had not had time to

fully conduct discovery. Saleem acknowledged that the parties had conducted significant discovery on an expedited basis, but he contended that such discovery was narrowly focused on the preliminary injunction hearing and not the full merits of the dispute.

¶ 22    After further discovery, the parties filed supplemental briefs. These briefs were dedicated almost entirely to (1) the section 2(B) default, (2) whether Quigg had provided adequate notice of default and an opportunity to cure, (3) Quigg's and Stocker's alleged waiver of their right to challenge the sufficiency of Saleem's December 2020 and 2021 section 2(B) payments, and (4) the failure to comply with section 9-620 of the UCC.

¶ 23    Saleem argued that pursuant to section 9-620 of article 9 of the UCC, Quigg and Stocker could not unilaterally take ownership of the collateral stock without obtaining Saleem's consent after default. Saleem further argued that even if Quigg gained ownership of the stock, she could only recover up to the amount of the outstanding debt. In other words, Saleem asserted that he was entitled to the equity he had put into the company through (1) all of the payments he had made under the terms of the sale documents; (2) the merger of his own engineering company with QEI, as expressly contemplated by the terms of the stock sale agreement; and (3) the increase in value and profitability of QEI under his leadership. Saleem contended that, consistent with his testimony before the court, QEI was worth $12 million based on its yearly contracts, revenue, and accounts receivable, which was significantly more than what he paid for it and how much he owed.

¶ 24    In her reply and supplemental briefing, Quigg claimed that the parties specifically agreed to the remedy of immediate vesting of rights in Quigg once an event of default had occurred. Section 8 of the pledge agreement expressly said that notice of default was not required and Quigg "may" sell the collateral in the manner provided for in article 9 of the UCC. Section 8 entitled Saleem to the surplus of any such sale but said nothing about Saleem being entitled to anything if

- 7 -

Quigg exercised any other remedy available to her under the UCC or under applicable law or equity. Quigg further explained that the note was a "nonrecourse" note, meaning that Quigg was not permitted to seek payment from Saleem personally and instead was required to seek satisfaction of the debt only through the collateral. As a result, it made sense that the parties explicitly agreed to retention of the collateral *in addition and as an alternative to* any remedies provided by the UCC, which explicitly permitted parties to agree to other remedies. Quigg pointed to section 9-207(b)(4)(C) (810 ILCS 5/9-207(b)(4)(C) (West 2018)), which provided that parties in possession of collateral may use that collateral in any manner agreed to by the parties. Quigg claimed that the retention provision of section 8 constituted such an alternative "use" of the collateral stock agreed to by the parties and therefore was authorized by the UCC.

¶ 25      In his supplemental briefing, Saleem argued that section 9-602 (*id.* § 9-602) contained a list of provisions in article 9 that could not be waived or varied by the parties, and section 9-620 was included on that list. Therefore, to the extent section 8 of the pledge agreement stated to the contrary, such language was unenforceable.

¶ 26                    E. The Trial Court's Summary Judgment Ruling

¶ 27      The trial court agreed with Quigg. In its written order entered in May 2023, the court determined that even though it did not believe notice was required based on the language of the sale documents, the June 16, 2022, notice from Quigg complied with the notice provisions relied on by Saleem. The court rejected Saleem's arguments regarding how to calculate the amounts he owed under section 2(B) of the notes.

¶ 28      Regarding Saleem's defense of waiver, the trial court found that section 2(B) required Quigg and Stocker to object to the net profit calculation within 30 days; however, the court explained that Saleem failed to provide the required financial documentation, consisting of

QEI's balance sheets and profit and loss statements, so that Quigg and Stocker could determine if the amounts of his section 2(B) payments were correct. The court disagreed with Saleem that Quigg and Stocker had actual notice of the financial condition of the company based on their positions in the company and rejected his assertion that, because they were copied on dozens of e-mails over the years with financial records attached, Saleem could be said to have substantially complied with the requirement in section 2(B) of the notes that he provide QEI's balance sheets and profit and loss statements along with his section 2(B) payments. The court concluded that the failure to provide the required financial documents was itself a material breach.

¶ 29       Regarding the immediate revesting of rights in the collateral and the various sections of article 9 of the UCC, the trial court determined that the express language of section 8 of the pledge agreements was clear and unambiguous: Quigg and Stocker were entitled to immediate vesting upon an event of default. The court disagreed strongly that Saleem "waived" any rights under section 9-620 because section 8 of the pledge agreement authorized Quigg and Stocker to proceed under that section or any other section of article 9 if they so chose. Instead, the parties had contracted for an alternative, which the court deemed appropriate given the nonrecourse nature of the note. According to the court, Quigg and Stocker selected a remedy, Saleem did not waive one, and nothing in that alternative remedy ran afoul of article 9.

¶ 30       The trial court concluded that Quigg and Stocker were entitled to take ownership of the stock upon Saleem's default, which they did on August 1, 2022. Accordingly, the court ordered that Quigg and Stocker were the rightful owners of QEI and entitled to immediate control over the company.

¶ 31                     F. The Postjudgment Motions

¶ 32       Following the entry of summary judgment, Stocker filed a motion to clarify that,

because she (1) stood in the same position as Quigg and (2) had filed her own motion for summary judgment in January 2023 adopting all of Quigg's arguments, the trial court's entry of summary judgment applied fully to her as well as Quigg.

¶ 33    Saleem filed several motions seeking clarification, reconsideration, leave to amend his counterclaims, and judgment on the pleadings. Saleem's motion for judgment on the pleadings argued that Quigg's declaratory judgment complaint was improper because it sought a finding of nonliability based on past action, better known as a breach of contract claim, which Illinois courts had long held cannot be addressed under the declaratory judgment statute because such actions were meant to declare existing rights governing the relationship between parties before they acted.

¶ 34    Saleem also argued extensively that the trial court improperly *sua sponte* dismissed his counterclaims based on a preliminary record. He sought leave to amend those claims to provide more detail and explain why those claims had not been resolved.

¶ 35    Saleem further claimed the trial court erred by entering summary judgment based on a preliminary record and by applying the wrong standard. Saleem again asserted that he needed further discovery to prove his claims. Moreover, he contended that instead of looking at the record in the light most favorable to Saleem as the nonmovant to determine if genuine issues of material fact existed, the court resolved factual disputes against him based on credibility determinations it made after the preliminary injunction hearing. Saleem also pointed out that in its written order, the court erred by ruling that Quigg was entitled to summary judgment in part because (1) Quigg had demonstrated a substantial likelihood of success and (2) Saleem had failed to do so. Saleem asserted that this was instead the standard for preliminary injunctions.

¶ 36    Quigg and Stocker filed responses, providing myriad arguments why the trial court should deny Saleem's requested relief. Relevant to our purposes, Quigg explained that the court

was permitted to and did exercise its discretion to enter declaratory relief to resolve the dispute between the parties—namely, who is entitled to control QEI. That was the core dispute between the parties, which dispute was entirely appropriate for a declaratory judgment action. Had Saleem succeeded, Quigg noted, then he would have remained the owner of QEI, and the sale documents would have continued to govern the parties. However, the court, after considering all of the evidence from the parties, including both live witness testimony and hundreds of documents, could only answer the question of who was entitled to control QEI by determining whether (1) Saleem was in breach and (2) Quigg and Stocker were entitled to ownership of the shares of stock under the plain terms of the sale documents. Quigg pointed out that nothing was left for the trial court to do and no purpose would be served by conducting a second hearing just to present the same evidence the parties had already presented to the court at the preliminary injunction hearing and as part of the summary judgment briefing.

¶ 37        In July 2023, the trial court denied all of Saleem's motions and (1) incorporated its January 2023 order, which denied Saleem's preliminary injunction, and its May 2023 order, which granted summary judgment in Quigg's favor, into its July 2023 order and (2) explained that it had already fully considered and rejected all of Saleem's claims, affirmative defenses, and counterclaims based on the findings in those orders.

¶ 38        The trial court elaborated in some detail, as to each defense and counterclaim, why the prior findings necessarily disposed of Saleem's claims. Count III was moot because it sought damages based on Quigg and Stocker wrongfully asserting ownership of QEI, and the court found they were, in fact, the owners. Regarding count I, the court concluded, in its January 2023 order, that Quigg was not required to sign the subordination agreement because it contained unreasonable terms that were less protective than those she had under the Bank of Springfield line of credit. And

the court reiterated at length its rejection of the application of article 9 of the UCC, emphatically refusing to rewrite the unambiguous terms of the sale documents that the parties had negotiated with the assistance of legal counsel.

¶ 39 The trial court denied leave to amend based in part on its rejection of the counterclaims on their merits and in further part on the untimeliness of the request. The court rejected the motion for judgment on the pleadings because Saleem himself had filed a claim for declaratory relief, and the court refused to let him change his position only after he had lost.

¶ 40 This appeal followed.

¶ 41 II. ANALYSIS

¶ 42 Saleem appeals, arguing that the trial court erred by (1) resolving factual issues and making credibility determinations on summary judgment, (2) ruling Saleem failed to raise any genuine issues of material fact as to his default and affirmative defenses, (3) dismissing, *sua sponte*, his counterclaims, and (4) finding that Quigg and Stocker were entitled to immediately retain the pledged shares in full satisfaction of the debt.

¶ 43 We affirm in part, vacate in part, and remand for further proceedings consistent with this order. Specifically, we conclude, albeit on different grounds, that the trial court's entry of summary judgment was proper as to (1) finding Saleem in default and (2) awarding Quigg and Stocker control of QEI. However, we agree with Saleem that the court erred by (1) declaring Quigg and Stocker the owners of the pledged shares and (2) dismissing Saleem's counterclaim based on article 9 of the UCC (810 ILCS 5/9-101 *et seq.* (West 2018)). We vacate all findings of the trial court other than those we have affirmed and remand for further proceedings consistent with this order.

¶ 44 A. The Applicable Law and Standard of Review

¶ 45        This case comes before us on the trial court's entry of summary judgment based on the terms of the sale documents and interpretation of article 9 of the UCC.

¶ 46        Summary judgment is appropriate when, viewing the evidence in the light most favorable to the nonmoving party, no genuine issue of material fact exists and the moving party's right to judgment as a matter of law is clear and free from doubt. *Johnson v. Armstrong*, 2022 IL 127942, ¶ 31, 211 N.E.3d 355. When examining whether a genuine issue of material fact exists, a court construes the evidence in the light most favorable to the nonmoving party and strictly against the moving party. *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 22, 131 N.E.3d 488. "The purpose of summary judgment is not to try a question of fact, but to determine whether one exists." *Larson v. Crosby*, 2024 IL App (4th) 230646, ¶ 64. A trial court's entry of summary judgment is reviewed *de novo*. *Monson v. City of Danville*, 2018 IL 122486, ¶ 12, 115 N.E.3d 81.

¶ 47        The rules governing the interpretation of statutes and the interpretation of contracts are well settled. When interpreting the meaning of a statute or contract, the fundamental rule is to ascertain and give effect to the legislature's or parties' intent, and the best indicator of that intent is the statutory or contractual language of the relevant provisions, given its plain and ordinary meaning. *Chapman v. Chicago Department of Finance*, 2023 IL 128300, ¶ 28, 220 N.E.3d 1080 (discussing statutory interpretation); *Clanton v. Oakbrook Healthcare Centre, Ltd.*, 2023 IL 129067, ¶ 30, 226 N.E.3d 1266 (discussing contract interpretation). A statute, like a contract, should be evaluated as a whole, and each provision must be construed in connection with every other relevant section. *Chapman*, 2023 IL 128300, ¶ 29; *Clanton*, 2023 IL 129067, ¶ 30. Issues of statutory construction and contract interpretation raise questions of law that an appellate court reviews *de novo*. *Chapman*, 2023 IL 128300, ¶ 28; *Clanton*, 2023 IL 129067, ¶ 31.

¶ 48        Quigg asserts that because the trial court entered summary judgment in her favor

on her declaratory judgment action, the standard of review for this court on appeal is whether the trial court abused its discretion. We reject this contention based on the well-reasoned opinion of the Second District in *In re Marriage of Rife*, 376 Ill. App. 3d 1050, 1055-61, 878 N.E.2d 775, 780-86 (2007), in which the Second District concluded that *de novo* review was the appropriate standard of review of a trial court's entry of summary judgment in a declaratory judgment action.

¶ 49　　　　　　　　　B. Entry of Summary Judgment on Saleem's Default

¶ 50　　　　　　　　　1. *Whether the Trial Court Properly Applied the*

*Summary Judgment Standards on the Issue of Saleem's Payment Default*

¶ 51　　　　The trial court entered summary judgment based on Saleem's failure to make accurate biannual net profit payments pursuant to section 2(B) of the note (the section 2(B) default). The parties dedicate much of their briefs to this issue and the issues related to it (for example, the accounting method the parties should use to properly calculate the amounts owed). Saleem argues that the court erred when it decided these issues in Quigg's favor by (1) making factual findings and credibility determinations on contested evidence from a preliminary injunction hearing, (2) failing to look at the evidence in the light most favorable to him as the nonmovant, and (3) applying, at times, the standard for preliminary injunctions rather than motions for summary judgment.

¶ 52　　　　Based on our review of the record, we conclude that the trial court did not strictly follow the standards for evaluating whether the entry of summary judgment is appropriate. For instance, the court incorporated and relied on its January 3, 2023, order denying Saleem's motion for a preliminary injunction when it granted Quigg's motion for summary judgment and then further explained those rulings when denying Saleem's postjudgment motions. In that January 3 order, the court also addressed and rejected the merits of some of Saleem's claims, even though

the only question it should have determined was whether Saleem had established the four elements required for injunctive relief. See *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 156, 601 N.E. 2d 720, 726 (1992) (setting out four factors and holding, "In ruling on a motion for preliminary injunctive relief, however, controverted facts on the merits of the case are not decided.").

¶ 53        Saleem had no obligation to prove his case at a preliminary injunction hearing. *Buzz Barton & Associates, Inc. v. Giannone*, 108 Ill. 2d 373, 386, 483 N.E.2d 1271, 1277 (1985) (at the preliminary injunction stage, the movant "need not carry the same burden of proof that is required to support the ultimate issue").

¶ 54        We are especially concerned about the trial court's statements because of the arguments to the court made by Quigg, as set forth in the background portion of this order, that appear to have led that court astray. For example, Quigg explicitly and repeatedly told the court, both in her arguments for summary judgment and in response to Saleem's motion to reconsider, that it had already disposed of Saleem's arguments and defenses when the court denied his request for injunctive relief. Quigg further argued to the trial court that it could decide these issues because the parties had extensively briefed them and presented four days of live testimony and evidence to the court. Quigg stated that no purpose would be served by conducting a trial on the merits just so the parties could present the same evidence and testimony for the court to decide the same questions. Indeed, at oral arguments before this court, Quigg made essentially the same arguments and even conceded that trial courts sometimes address the ultimate merits of the parties' claims at a preliminary injunction hearing. Quigg suggested that this court should affirm the entry of summary judgment because (1) the trial court expressly asked the parties to present significant evidence in support of their claims and (2) Saleem was able to fully litigate his counterclaims at the preliminary injunction hearing. Quigg's assertions are simply incorrect. See *Machnicki v.*

*Nowobilski*, 2024 IL App (3d) 230306-U, ¶ 45 ("Illinois law is clear that it is 'serious procedural error' to treat a hearing on a motion for preliminary injunction as a 'full scale hearing on the merits and permanently dispose[ ] of all pending matters.' " (quoting *Nopolous v. McCullough*, 95 Ill. App. 3d 852, 853, 420 N.E.2d 734, 853 (1981))).

¶ 55　　　　Even if Quigg's suggestion that the parties would present the exact same evidence at trial had some truth to it, summary judgment is not a substitute for trial. Summary judgment requires the trial court to strictly construe the evidence in favor of the nonmovant and against the movant. *Freesmeyer*, 2019 IL 122654, ¶ 22. Trials, by contrast, serve the crucial purpose of presenting live testimony after the parties have adequately conducted discovery precisely so the fact finder, here the trial court, can evaluate the evidence as it sees fit without deference to one side or the other.

¶ 56　　　　We note that Quigg did present and argue the correct standard for summary judgment both in her written motions and oral arguments. However, the trial court was apparently persuaded by her assertions that we have highlighted because it used very similar language in its orders, which, when read as a whole, indicate strong agreement with Quigg's arguments. Although the bulk of Quigg's arguments relied on the proper standards, her statements encouraging the trial court to bend the rules, which at first blush have intuitive appeal, have tainted the record, by which we mean those statements and the trial court's reliance on them makes it very difficult to conclude Saleem was not prejudiced by the court's apparent errors.

¶ 57　　　　Put another way, even with *de novo* review, it appears that the trial court, encouraged in part by Quigg, conclusively decided issues based on preliminary evidence from Saleem who, quite correctly, proceeded under the impression that the court (1) would *not* transform Saleem's failure to succeed at the preliminary injunction hearing into a final

determination that Saleem's claims failed on their merits and (2) *would* properly consider that evidence anew, in the light most favorable to Saleem at summary judgment and without prejudgment.

¶ 58        We recognize that our standard of review is *de novo*, meaning we conduct the same analysis as the trial court, without any deference to its findings of fact or conclusions of law. However, after thoroughly reviewing the record and the arguments of the parties, both in the trial court and before this court, we are unable to conclude that Quigg's right to judgment as a matter of law is "clear and free from doubt." Given this context, we conclude that vacating the trial court's findings on these and all other issues we do not affirm is the most appropriate course of action.

¶ 59        2. *Saleem's Line of Credit Default Is an Alternative Ground To Affirm*

¶ 60        Although we vacate the trial court's findings regarding Saleem's section 2(B) default and accompanying defenses, we may affirm based on any grounds apparent in the record. On that basis, we conclude that no genuine issue of material fact exists as to Saleem's line of credit default with Bank of Springfield and affirm the court's grant of summary judgment.

¶ 61        To begin, we recognize that regarding the issue of whether Saleem had defaulted under the sale documents, the parties spent the majority of their arguments before the trial court, and all of them to this court, addressing the section 2(B) default. Nonetheless, Quigg's verified complaint spends an equal amount of time addressing the line of credit default as it does the section 2(B) default. And in her motion for partial summary judgment on the issue of Saleem's default, Quigg clearly raised the line of credit default as one basis on which no material factual issues existed and she was entitled to judgment as a matter of law.

¶ 62        Saleem's response to that motion did not address this ground and was relatively short due to his need for further discovery. Each of the parties underwent a discovery deposition

and testified at the evidentiary hearing, and they testified about the line of credit default. Further, the parties conducted an evidence deposition of Mike Halsne, the loan committee member in charge of QEI's line of credit loan, and submitted it to the trial court as part of the evidentiary hearing.

¶ 63 Accordingly, Saleem (1) was aware Quigg asserted the line of credit default as an independent ground for Saleem's default under the sale documents; (2) conducted adequate discovery on the issue; and (3) as we explain below, (a) offered nothing more than a conclusory denial of the line of credit default and (b) admitted, along with his wife, Samina, to using the unauthorized disbursements for personal reasons and never attempting to return them. Saleem cannot claim any prejudice. Indeed, at oral arguments, Saleem conceded that, other than his conclusory testimony at the preliminary injunction hearing, nothing in the record contradicted that he was in default under the terms of the Bank of Springfield line of credit.

¶ 64 C. Saleem's Default on the Bank of Springfield Line of Credit

¶ 65 Quigg filed two motions for partial summary judgment, seeking determinations that (1) Saleem was in default under the terms of the sale documents for (a) failing to make sufficient mandatory prepayments under section 2(B) of the note and (b) defaulting on the Bank of Springfield line of credit and (2) those sale documents did not require her to sign the subordination agreement with Signature Bank, which had issued a commitment to extend a line of credit to QEI. Saleem responded by asserting that genuine issues of material fact existed regarding, in relevant part, Quigg's failure to (1) give Saleem a notice of default that complied with the requirements of the sale documents and (2) execute the subordination agreement with Signature Bank, which contained reasonable terms and conditions as demonstrated by Stocker's signing the same agreement. The trial court granted Quigg's motions for summary judgment, finding that Quigg

provided adequate notice of default, even though notice was not required under the circumstances, and Quigg was not required to sign the subordination agreement because its terms were (1) much less protective than what Quigg had under Bank of Springfield's line of credit and therefore (2) unreasonable as a matter of law.

¶ 66       We conclude that the sale documents explicitly stated that a default on the senior indebtedness, *i.e.*, the Bank of Springfield line of credit, constituted a default under the terms of the pledge agreement and therefore a cross-default under the other sale documents. No genuine issue of material fact exists that Saleem took several hundred thousand dollars of unauthorized distributions in the form of cash stock dividends, which were unauthorized under the terms of the Bank of Springfield line of credit because he used those funds for purposes other than operating QEI, making payments on the stock purchase, or for income taxes.

¶ 67       We note that the plain language of the sale documents required Quigg and Stocker to give Saleem written notice of default, regardless of the type of default alleged, setting forth (1) the breach, (2) how to cure it, (3) the deadline to cure it, and (4) that failure to cure it would result in Quigg's exercising her rights and remedies under the sale documents. On June 16, 2022, with regard to Saleem's default on the Bank of Springfield line of credit, Quigg complied with these requirements and properly gave Saleem a written notice of default that contained the information required by section 9 of the pledge agreements and section 10 of the notes.

¶ 68       Saleem failed to cure the default in that he never returned the excessive disbursements to QEI and did not establish a new line of credit for QEI through another lender. Because Saleem failed to provide Quigg with the subordination agreement Signature Bank required for the new line of credit until after the expiration of the cure period, Quigg's failure to sign the subordination agreement or negotiate reasonable terms for the same with Signature Bank

did not excuse Saleem's default.

¶ 69        We affirm the trial court's entry of summary judgment on the existence of Saleem's default, and we vacate all factual findings and conclusions of law made by the trial court other than those explicitly affirmed in this order. We express no opinion on the ultimate merits of the issues or the correctness of the trial court's findings and make clear that all matters not affirmed may be addressed on remand, including through further summary judgment proceedings.

¶ 70        1. *Saleem's Unauthorized Distributions Constituted a Default*

*Under the Sale Documents*

¶ 71        a. The Pledge Agreement Expressly Provided That a Default

on the Line of Credit Constituted an Event of Default

Under the Pledge Agreements

¶ 72        First, the terms of the sale documents, specifically the pledge agreements, explicitly provided that a default on the Bank of Springfield line of credit, identified as the "Senior Indebtedness" in the sale documents, also constituted an event of default. The Quigg and Stocker notes, in section 4, both expressly incorporate by reference the respective pledge agreements. Section 14 of the pledge agreements provides that "[a] default under this Agreement *or the Senior Indebtedness* shall constitute a default under" (emphasis added) the notes to Quigg and Stocker and the stock sale agreement. The terms of the Bank of Springfield line of credit expressly prohibited QEI from paying cash dividends on stock to its shareholders unless (1) Bank of Springfield approved the disbursement in writing or (2) such dividend disbursement was made for the purpose of paying incomes taxes incurred as a result of ownership of QEI's stock. Relatedly, the line of credit permitted the use of loan proceeds solely for QEI's business operations unless otherwise approved in writing. (We note that (1) the parties agreed before the trial court that stock

purchase payments to Quigg and Stocker were authorized by Bank of Springfield and (2) Halsne confirmed the same.)

¶ 73           b. Saleem's Actions Violated the Terms of the Agreement

¶ 74           Second, even strictly construed in favor of Saleem, the undisputed evidence in the record demonstrates that Saleem took unauthorized disbursements from QEI and the Bank of Springfield line of credit that were not used for business operations, payment of Saleem's income tax liabilities based on his ownership of QEI's stock, or to cover stock buyout payments to Quigg and Stocker. Halsne testified about the distributions at his deposition, Stocker identified the disbursements on QEI financial statements and reports, which were admitted into evidence, and Samina confirmed that in 2021, she and Saleem took a $300,000 disbursement to purchase a property in their personal capacities and not on behalf of QEI. According to Halsne at his evidence deposition, the Bank of Springfield loan committee decided not to renew QEI's line of credit because the disbursements had caused severe cash flow problems for QEI and Bank of Springfield was no longer willing to loan money to QEI at all. The testimony of Halsne and others confirmed that Bank of Springfield informed Saleem that QEI needed to find another lender.

¶ 75           Most important, Saleem's testimony and communications with Halsne corroborated the other evidence that he took unauthorized disbursements. Saleem acknowledged that he e-mailed Halsne on June 13, 2022, which e-mail was admitted into evidence at the preliminary injunction hearing, and informed him that "we took some money as a dividend" at the beginning of 2021 and "[a] portion was used to pay taxes." Saleem then wrote the following: "At the end of the year I did take another $300K for which I apologize… I should have checked with you. Before today, I didn't realize there was a stipulation in the contract, otherwise I wouldn't have done it." Saleem agreed he never returned the money, and his only explanation was that Bank of

Springfield did not ask for the money back.

¶ 76    Although during his testimony Saleem emphatically denied he defaulted on the line of credit, took unauthorized disbursements, or admitted any wrongdoing in his e-mail, Saleem did not provide any evidence, other than his own testimony, to support his conclusory statements, and the record is devoid of contrary facts that would prevent summary judgment. (We again note that Saleem conceded at oral arguments before this court that no other evidence in the record supported his self-serving testimony that he was not in default on the line of credit.) And, even though Saleem testified that he set aside the $300,000 in order to purchase an office building (in his name to lease back to QEI) to consolidate QEI's Chicago offices, thereby significantly decreasing QEI's expenses, when asked where the money was and what it was being used for, Saleem admitted he was using it to pay his litigation costs for defending against Quigg's lawsuit.

¶ 77    Based on the foregoing, we conclude the trial court's entry of summary judgment on the issue of Saleem's default was proper because no genuine issue of material fact existed that Saleem was in default under the Bank of Springfield line of credit, and therefore the share pledge agreements and notes.

¶ 78    2. *Saleem's Defense of Failure To Provide Proper Notice of Default*

¶ 79    Saleem argues that the trial court erred by finding that (1) no notice of default was required and (2) to the extent that notice was required, the June 16, 2022, notice of default letter provided adequate notice. Saleem argues that written notice was required under the terms of the sale documents, specifically section 9 of the share pledge agreements. Quigg claims that notice was not required because Saleem made a payment default and the notes and share pledge agreements explicitly provide notice is not required for payment defaults.

¶ 80    Ultimately, we conclude that the record demonstrates no genuine issue of material

fact exists that Saleem was in default under the terms of the Bank of Springfield line of credit and the notice of default complied with section 9 regarding that breach.

¶ 81                              a. Written Notice of Default Was Required

¶ 82          Section 9 of the share pledge agreements provides that all notices "required or permitted to be given or made hereunder shall be given in the manner and to the place as provided in the Purchase Agreement for notices to the party to whom such notice is given." Section 6.12 of the stock sale agreement provides, "All notices and other communications hereunder shall be in writing and shall be deemed given when mailed, delivered personally, sent by email (which is confirmed), or sent by an overnight courier service" to the parties and their lawyers at specified addresses. Section 9 of the share pledge agreements further provides:

> "*Notwithstanding anything to the contrary contained herein*, in the event of *any breach hereof or default hereunder*, Pledgee shall provide notice to the pledgor specifying: (a) the breach; (b) the action required to cure such breach; (c) the date by which such breach must be cured as provided hereunder; and (d) that failure to cure such breach on or before the date specified in the notice may result in an Event of Default hereunder." (Emphases added.)

(We note that section 10 of the notes contains an essentially identical "notwithstanding" clause with slight differences in wording tailored to the acceleration provisions of the notes.)

¶ 83          Based on these provisions, which are all incorporated by reference into the share pledge agreements and thereby into the notes, written notice of *any* default was required to be given to Saleem with an opportunity to cure.

¶ 84           b. Quigg Provided Sufficient Notice of the Line of Credit Default

¶ 85          In its written order, the trial court made an alternative finding that even if notice

- 23 -

was required, Quigg and Stocker gave adequate notice to Saleem by sending him a letter dated June 16, 2022, titled "Notice of Default," which letter was sent via overnight courier, e-mail, and also to his attorneys designated in the stock sale agreement. That June 16 notice of default stated that Saleem had defaulted under the provisions of the sale documents by (1) making distributions of $1.4 million in 2020 and $1.3 million in 2021, "which are well in excess of the amounts permitted for salary and necessary for estimated tax payments," in violation of section 4.3 of the stock sale agreement; (2) failing to make adequate section 2(B) mandatory prepayments in 2020 and 2021 based on those distributions compared to the total amounts Quigg and Stocker received in payments in those years of $785,000 and $740,000, respectively; and (3) defaulting on the Bank of Springfield line of credit, which notice of default from Bank of Springfield was attached.

¶ 86    The June 16 notice of default further provided that the defaults could be cured by returning "all disbursements to [QEI] over and above those amounts permitted in the Sale Agreement, and remit payment to Payee for the full amounts due to them under their respective Promissory Notes." The notice further demanded that supporting documentation for all payments be provided in order to cure the default. Finally, the notice stated that if Saleem did not cure the default as requested within 30 days (or by July 18, 2022), Quigg intended to exercise her rights under the sale documents to (1) accelerate all amounts due under the notes; (2) charge interest at the "Default Rate" (8.5% instead of 4.5%) from the time of the first breach, which would be determined later; (3) invoke her rights under section 8 of the pledge agreement "to declare that all rights of [Saleem] pursuant to Paragraph 6 of the Quigg Pledge Agreement shall hereby immediately vest in [Quigg]"; and (4) use all rights and remedies provided by article 9 of the UCC and any other applicable law, including conducting a public sale, "retain[ing] the shares as satisfaction of the debt," or "otherwise enforc[ing] her security interest through judicial

proceeding."

¶ 87        Saleem argues that the June 16 notice of default is insufficient because it relied on section 4.3 of the stock sale agreement as a basis for the default, but section 4.3 was deleted by amendment of the parties in 2019. Further, Saleem contends the notice did not provide adequate information about the breach or how to cure because it did not provide an amount that Quigg and Stocker believed they were owed pursuant to section 2(B).

¶ 88        The fact that the notice refers to a deleted provision is of no moment. The substance of the notice clearly identifies the two breaches as (1) defaulting under the Bank of Springfield loan and (2) failing to make adequate section 2(B) payments. Section 9 did not require Quigg to identify the relevant provision of the sale documents, and the notice's referring to a deleted section did not cause any confusion. Similarly, Quigg's failure to provide a specific payment amount did not render the entire notice ineffective; this is particularly true considering that Quigg included a copy of the Bank of Springfield notice of default, which *did* give a specific dollar amount, with her June 16, 2022, notice of default to Saleem. Most important, the notice unquestionably provided the necessary information required by section 9 regarding Saleem's alleged default on the Bank of Springfield line of credit. Saleem has never argued that (1) he did not default on the line of credit or (2) by breaching the terms of the line of credit, he was nevertheless not in default under the terms of the sale documents. Accordingly, the notice of default was sufficient as to that alleged default.

¶ 89        The June 16 notice of default specifically identified the default of the Bank of Springfield line of credit as one basis for Saleem's default under the sale documents. Although section 4.3 was subsequently deleted, the terms contained therein were substantially identical to the terms in the line of credit restricting the amounts and purposes of disbursements for stock

dividends. Reading the letter as a whole, Saleem was clearly informed of the basis for the breach and that he could cure it by returning the unauthorized disbursements to QEI or he risked Quigg claiming all of his rights in the QEI stock she held as collateral.

¶ 90        3. *Saleem's Failure To Cure and His Defense That Quigg's Failure To Execute the Subordination Agreement Prevented Him From Curing*

¶ 91        Section 7(A) of the pledge agreements and section 6(b) of the notes both provide that an event of default occurs when a breach of any covenant or obligation under the sale documents goes uncured for 30 days after written notice of the breach is given. As we explained earlier, aside from his own conclusory and unsupported statements, Saleem has not pointed to anything in the record that contradicts Quigg's evidence that he took disbursements of over $600,000 as unauthorized stock dividends despite the unambiguous restrictive covenants in the Bank of Springfield line of credit agreement. Saleem claimed that no one asked him to return the money, but he acknowledged receipt of the June 16 notice of default, which clearly states the unauthorized distributions must be returned to QEI, with supporting documentation, no later than July 18, 2022.

¶ 92        Saleem testified, and Samina and other evidence (such as Saleem's e-mail to Halsne) confirmed, that he took a disbursement of $300,000 to purchase an office building in his name, which he intended to lease back to QEI. Even assuming, as evidence in the record suggests, that Saleem's personally purchasing an office building for QEI to lease, as Quigg herself had done, was arguably a sound business decision made in good faith for QEI's benefit, Saleem admitted (1) he took other disbursements that he only partially used to pay taxes, with no further explanation, and (2) the $300,000 he had set aside to purchase the office building for QEI's use was currently being used by him to pay his personal litigation expenses defending the lawsuit.

Accordingly, no genuine issue of material fact exists that Saleem took unauthorized disbursements that he was using personally, not for QEI, and he never returned the money to QEI as demanded, much less within the 30-day cure period.

¶ 93    We note that Saleem argues that Quigg breached her obligations by not negotiating and signing the Signature Bank subordination agreement, which ostensibly would have given QEI and Saleem the ability to cure the Bank of Springfield default. Saleem also briefly mentions that Quigg failed to sign the 90-day extension agreement with Bank of Springfield to give him and QEI more time to secure another lender. However, Saleem makes these arguments when asserting why the trial court erred by dismissing his counterclaims, which are based primarily on these instances of Quigg's interfering with QEI's business operations. Neither before the trial court nor this court did Saleem explicitly (or even just clearly) claim Quigg's failure to sign the extension agreement constituted a defense to his default. (Saleem does not and cannot make such a claim against Stocker because Stocker (1) was not required by Bank of Springfield to sign the extension agreement and (2) did sign the subordination agreement required by Signature Bank as a precondition to extending QEI a line of credit.)

¶ 94    In any event, we conclude that Saleem's contentions do not raise an issue of material fact regarding his failure to cure his taking unauthorized distributions. The June 16 notice of default specified that Quigg would deem the default under the Bank of Springfield line of credit to be cured so long as Saleem tendered the full amount of the unauthorized distributions back to QEI. The notice of default does not mention obtaining a new line of credit was required to cure the alleged default under the sale documents, and that makes sense given that (1) the line of credit did not mature until June 30, 2022, meaning it could be paid in full on time if the disbursements were returned, and (2) if the funds were returned to QEI, QEI could use them for operating

expenses, thereby arguably making them authorized distributions. Whatever the reason, Quigg was entitled to dictate the actions necessary for her to deem Saleem's default cured, and the actions she decided were appropriate to cure were (1) returning the disbursements to QEI and (2) providing supporting documentation for the same.

¶ 95    To the extent Saleem claims Quigg's refusal to sign the subordination agreement prevented him from curing, we are not persuaded to reach a different conclusion. As previously mentioned, the only evidence Saleem offered regarding why he had not returned the distributions was his own testimony that no one ever asked him to do so. Although Bank of Springfield did not make a request, Quigg did, and because the pledge agreement specifically deemed a default on the senior indebtedness constituted a default under the sale documents, Quigg's request is the only one that matters. Most important, Saleem's assertions regarding Quigg's failure to sign the subordination agreement also form the basis for count I of his counterclaim for breach of contract, and Saleem may fully recover any damages he suffered as a result of Quigg's failure to sign, assuming Saleem succeeds on the merits of his claim on remand.

¶ 96                                    4. *Summary*

¶ 97    Based on our review of the record, we conclude that no genuine issue of material fact exists that (1) Saleem defaulted on the Bank of Springfield line of credit, (2) Quigg provided the required written notice of that default, and (3) Saleem did not cure the default within 30 days of his receiving notice.

¶ 98        D. The Automatic Vesting Provision Violates Article 9 of the UCC

¶ 99        Next, Saleem argues that the trial court erred by rejecting the merits of his arguments and counterclaims that were predicated on the applicability of certain nonwaivable provisions of article 9 of the UCC and Quigg's failure to comply with the requirements of those

provisions. Specifically, Saleem relies on section 9-620 of the UCC (810 ILCS 5/9-620 (West 2018)), which permits a secured party to retain collateral in satisfaction of a debt only if the debtor has agreed to such a result in a writing authenticated after default. Saleem argues that the court incorrectly ruled that (1) section 9-620 was inapplicable to this case, not because Saleem waived that provision but because he agreed to an alternate remedy, and (2) Quigg's August 1, 2022, election to accept the pledged stock in full satisfaction of Saleem's debt was authorized and effective under the express terms of the pledge agreement.

¶ 100    To analyze this claim, we begin by explaining why article 9 of the UCC applies and what section 9-620 requires.

¶ 101                    1. *The Applicability of Article 9*

¶ 102    "Article 9 of the UCC (810 ILCS 5/9-109(a)(1) (West 2020)) 'applies to any transaction, regardless of its form, that intends to create a security interest in personal property.' " *McGrath as Trustee of Michael J. McGrath Trust No. 1 v. Addy & McGrath Fireworks, Inc.*, 2022 IL App (3d) 210013, ¶ 21, 216 N.E.3d 1060 (quoting *Malek v. Gold Coast Exotic Imports, LLC*, 2018 IL App (1st) 171459, ¶ 17, 107 N.E.3d 1013). Among other things, article 9 sets forth the rules governing (1) how creditors create and perfect a security interest, or lien, in collateral used as security for a loan (810 ILCS 5/9-301 to 9-316 (West 2018)); (2) determining the priority of competing security interests in the same collateral (*id.* §§ 9-317 to 9-339); (3) the rights and remedies of creditors and debtors before and after default (*id.* §§ 9-207 to 9-210, 9-601 to 9-628); and (4) the sale and disposition of collateral in satisfaction of a debt (*id.* §§ 9-610 to 9-622).

¶ 103    Here, the parties agree that the UCC applies because Saleem pledged the certificated stock as collateral, giving Quigg and Stocker a security interest in that collateral in the event of a default. The parties further agree that Quigg and Stocker attempted, after they declared

- 29 -

Saleem in default, to take ownership of the shares under section 8 of the pledge agreements as a complete remedy. Section 8 provides as follows:

"[U]pon the occurrence of an Event of Default under this Agreement, all Obligations shall, at the election of the Pledgee, become immediately due and payable, without notice to the Pledgor, and all rights of the Pledgor in respect to the Collateral, including all rights of the Pledgor under the terms of Section 6 shall immediately vest in the Pledgee. In addition to having all rights and remedies provided under other provisions hereof or provide[d] in Article 9 of the Uniform Commercial Code of the State of Illinois (the 'Code') and any other applicable law, subject to the rights of the Senior Lender, if applicable, the Pledgee may sell the Collateral in the manner permitted by Article 9 of the Code."

¶ 104        Section 6 provides that "[u]nless and until an Event of Default has occurred and is continuing," Saleem was entitled "to receive all cash distributions paid in respect of the Shares" and "to exercise any voting and/or consensual powers pertaining to the Shares or any part thereof, for all purposes not inconsistent with the terms of this Agreement."

¶ 105        Based on the above, Quigg and Stocker claim the pledge agreements immediately vested, at their election, all of Saleem's rights in the stock. They assert that this result is proper because the note was a "nonrecourse note," which meant they could only seek to recover the outstanding debt through the collateral and not Saleem personally. Saleem argues that this remedy is known as "strict foreclosure" and is governed by section 9-620 of the UCC.

¶ 106                                    2. *Section 9-620*

¶ 107        Section 9-620 is titled "Acceptance of collateral in full or partial satisfaction of obligation; compulsory disposition of collateral" and provides as follows:

- 30 -

"(a) Conditions to acceptance in satisfaction. Except as otherwise provided in subsection (g) [(which deals with consumer transactions)], a secured party may accept collateral in full or partial satisfaction of the obligation it secures *only if*:

(1) *the debtor consents to the acceptance under subsection (c)*;

\* \* \*

(b) Purported acceptance ineffective. A purported or apparent acceptance of collateral under this Section *is ineffective unless*:

(1) the secured party consents to the acceptance in an authenticated record or sends a proposal to the debtor; and

(2) *the conditions of subsection (a) are met*.

(c) Debtor's consent. For purposes of this Section:

\*\*\*

(2) a debtor consents to an acceptance of collateral in full satisfaction of the obligation it secures *only if the debtor agrees* to the terms of the acceptance in a record authenticated *after default* or the secured party:

(A) sends to the debtor *after default* a proposal that is unconditional or subject only to a condition that collateral not in the possession of the secured party be preserved or maintained;

(B) in the proposal, proposes to accept collateral in full satisfaction of the obligation it secures; and

(C) does not receive a notification of objection authenticated by the debtor within 20 days after the proposal is sent." (Emphases added.) 810 ILCS 5/9-620(a)-(c) (West 2018).

¶ 108          "In construing the UCC, this court has also looked to the UCC official comments to discern the legislature's intent." *Whitaker v. Wedbush Securities, Inc.*, 2020 IL 124792, ¶ 16, 162 N.E.3d 269. "[T]he Illinois UCC is based on the Uniform Commercial Code enacted by all 50 states and, therefore, decisions from other states and federal case law may be helpful in this analysis. In the absence of Illinois cases on the subject, Illinois courts have looked to UCC decisions from other jurisdictions." *Id.* ¶ 20 (citing *Patrick v. Wix Auto Co.*, 288 Ill. App. 3d 846, 850, 681 N.E.2d 98, 101 (1997)).

¶ 109          Comment 2 says that section 9-620 "deal[s] with strict foreclosure, a procedure by which the secured party acquires the debtor's interest in the collateral without the need for a sale or other disposition under Section 9-610." 810 ILCS Ann. 5/9-620, UCC Comment 2 (Smith-Hurd 2022). As noted in comment 5 to section 9-620, "[t]o ensure that the debtor cannot unilaterally cause an acceptance of collateral," "acceptance does not occur unless, in addition, the secured party consents to the acceptance in an authenticated record or sends to the debtor a proposal." 810 ILCS Ann. 5/9-620, UCC Comment 5 (Smith-Hurd 2022).

¶ 110          Illinois has held since the 1970s that a creditor's purported retention of collateral in satisfaction of a debt is *ineffective*—that is, the creditor *does not take ownership of the collateral*— if the creditor fails to comply with the consent or written notice requirement of section 9-620. *Stensel v. Stensel*, 63 Ill. App. 3d 639, 642, 380 N.E.2d 526, 529 (1978); *Patrick*, 288 Ill. App. 3d at 850-52; *Munao v. Lagattuta*, 294 Ill. App. 3d 976, 981-82, 691 N.E.2d 818, 821-22 (1998) (holding, based on prior Illinois cases and cases from other jurisdictions, that retention of collateral is ineffective if notice requirements of the UCC are not complied with). See *First American Bank v. Poplar Creek, LLC*, 2024 IL App (1st) 230551, ¶ 31 (explaining, based on comment 5 to section 9-620, that mere acceptance of physical possession of collateral does not amount to retention in

satisfaction of a debt).

¶ 111        Courts in other jurisdictions have held the same. See *Born v. Born*, 304 Kan. 542, 564, 374 P.3d 624, 638 (2016) (holding plaintiff was "prohibited by law from strictly foreclosing on the collateral [shares of stock] without the consent and over the objection of the [defendant]"); *Fletcher v. Cobuzzi,* 499 F. Supp. 694, 699 (W.D. Pa.1980); *Chen v. Profit Sharing Plan of Donald H. Bohne, DDS, P.A.*, 216 Ga. App. 878, 880, 456 S.E.2d 237, 240 (1995) (holding failure to comply with article 9 rendered retention ineffective and that automatic transfer provision in contract was "nothing more than an unenforceable attempt at predefault waiver of the debtor's rights under Article 9"); *Kapor v. RJC Investment, Inc.*, 2019 MT 41, ¶ 23, 434 P.3d 869 (holding retention of mobile home was not effective and section 9-620 could not be waived).

¶ 112        Here, Saleem did not consent to the acceptance of the collateral in satisfaction of the debt, and Quigg and Stocker did not send a written proposal to Saleem. Because the parties did not comply with section 9-620, the "purported or apparent acceptance of collateral *** is ineffective." 810 ILCS 5/9-620(b) (West 2018).

¶ 113        3. *The Terms of Section 9-620 Cannot Be Waived or Varied by the Parties*

¶ 114        Quigg acknowledges that she did not comply with section 9-620 because, she argues, the terms of the pledge agreements provided an alternative remedy by agreement: the automatic transfer described in section 8. Quigg asserts that the automatic transfer provision in section 8 of the pledge agreements is consistent with article 9 because section 9-601(d) explicitly permits parties to secured transactions to vary the application of Article 9 by agreement. See *id.* § 9-601(d) ("[A]fter default, a debtor and an obligor have the rights provided in this Part and by agreement of the parties.").

¶ 115        However, as Saleem correctly argues, the plain language of section 9-601(a) states,

"After default, a secured party has the rights provided in this Part and, *except as otherwise provided in Section 9-602*, those provided by agreement of the parties." (Emphasis added.) *Id.* § 9-601(a). Section 9-602 expressly provides that "to the extent that they give rights to a debtor or obligor and impose duties on a secured party, the debtor or obligor *may not waive or vary* the rules stated in the following listed Sections." (Emphasis added.) *Id.* § 9-602. And section 9-620 is listed as one of the sections that the parties cannot alter. *Id.* § 9-602(10).

¶ 116        Courts uniformly agree that section 9-620 may not be waived. *Stensel*, 63 Ill. App. 3d at 642 (holding, under a prior version of section 9-620, "Notice is required by the plain meaning of the section and none was given. Under section 9-501(3) quoted above, such notice could not be waived and no other agreement appears in the record. It follows that [the plaintiff] could not retain the collateral in discharge of the obligation."); *March v. Linn*, 2015 WI App 43, ¶ 10, 865 N.W.2d 885 ("The provisions of § 409.620 may not be waived by the parties."); *In re Schwalb*, 347 B.R. 726, 748 (Bankr. D. Nev. 2006) (holding section 9-620 may not be waived or varied by parties and collecting cases); *In re Cadiz Properties, Inc.*, 278 B.R. 744, 748 (Bankr. N.D. Tex. 2002) (holding provision in contract allowing for retention and forfeiture of ownership in stock pledged as collateral violated section 9-620); *In re CBGB Holdings, LLC*, 439 B.R. 551, 555 (Bankr. S.D.N.Y. 2010) ("The remedy is only available if the debtor consents to strict foreclosure *after* it has defaulted. Thus, for example, the debtor cannot consent to strict foreclosure in anticipation of a future default at the time it enters into the transaction that creates the debt and security interest," and "[t]he requirements of § 9-620 may not be waived."); *IFG Leasing Co. v. Gordon*, 776 P.2d 607, 614 (Utah 1989); *Kraenzler v. Brace*, 2009 WI App 131, ¶ 16, 275, 773 N.W.2d 481 (holding that section 9-602 prevents parties from opting out of UCC provisions listed therein, including the right of redemption, and collecting cases); *Smith v. Community National Bank*, 344 S.W.3d 561,

568 (Tex. App. 2011); *Born v. Born*, 304 Kan. 542, 558, 374 P.3d 624, 635 (2016).

¶ 117 Quigg argues that these cases are distinguishable because they do not involve nonrecourse notes. However, Quigg provides no authority to support her conclusory statement that this distinction makes a difference. Importantly, nothing in the UCC even suggests that a nonrecourse note affects the rights or remedies of the parties to a secured transaction; but section 9-602 *does* permit a secured party to waive its rights. *Born*, 304 Kan. 542, 559 ("Again, the parties' agreements could waive or vary Sharon's rights without violating [section] 9-602."). Moreover, as Saleem points out in his brief, Quigg and Stocker have not provided this court any authority from any source countenancing the automatic transfer of ownership of collateral or predefault waiver of section 9-620's requirements.

¶ 118 Here, the trial court insisted that its ruling did not rest on a finding that Saleem waived any rights under section 9-620. Instead, the court maintained that Saleem simply contracted for an alternative remedy in addition to those provided by the UCC and found that Quigg properly invoked that alternative remedy after Saleem's default. However, that alternative remedy was, in reality, precisely the remedy provided for in section 9-620: acceptance of collateral in full satisfaction of the debt. The trial court's finding was waiver by a different name.

¶ 119 Our conclusion is best exemplified by Quigg's counsel's arguments to the trial court on this issue. Counsel informed the trial court that because the parties entered into a nonrecourse note and pledge agreement, the court's judgment declaring Quigg the owner of the stock fully resolved the dispute between the parties. All of Saleem's debts and obligations under the agreement terminated, and he was no longer liable on those agreements in any respect. Counsel stated that nothing in the sale documents gave Saleem any right or claim to any surplus or set-off in the event of default. The plain language said that all Saleem's rights immediately vested in

Quigg and discharged Saleem. Had Saleem wanted any set-off or surplus, the time to ask for it was when the parties negotiated the purchase agreement and agreed to this alternative remedy.

¶ 120 Counsel's statements perfectly describe the remedy of strict foreclosure, which is codified in the UCC in sections 9-620 to 9-622 (810 ILCS 5/9-620 to 9-622 (West 2028)). It is impossible to understand Quigg's acceptance of collateral in full satisfaction of the debt as anything other than just that. Accordingly, the trial court erred by granting Quigg ownership of the QEI stock and finding that the UCC permitted the parties to agree that Quigg could elect to retain the collateral shares in satisfaction of the debt without Saleem's postdefault consent. This conclusion is inescapable (1) under the plain language of the UCC, (2) pursuant to long-standing Illinois case law, and (3) based on uniform precedent across the country.

¶ 121                    4. *The Applicability of Section 9-207*

¶ 122 Quigg argued, and the trial court agreed, that section 9-207(b)(4)(C) (810 ILCS 5/9-207(b)(4)(C) (West 2018)) permitted the parties to agree to the strict foreclosure remedy set forth in section 8 of the share pledge agreements. Section 9-207(b)(4)(C) provides, "[I]f a secured party has possession of collateral: *** the secured party may use or operate the collateral *** in the manner and to the extent agreed by the debtor." *Id.* Section 9-207 cannot be interpreted to provide such a result for two reasons.

¶ 123 First, section 9-207 applies to a secured party's use and operation of collateral in its possession either before or after default. *Id.* § 9-207, UCC Comment 4. By contrast, section 9-620 deals solely with the acceptance of collateral *after* default. *Id.* § 9-620. Well-settled rules of statutory interpretation provide that a more specific provision controls over a general one. *Kloeppel v. Champaign County Board*, 2022 IL 127997, ¶ 22, 215 N.E.3d 902. Because section 9-620 deals with acceptance of collateral in satisfaction of a debt after default, it is more specific to the facts

of this case and controls.

¶ 124       Second, and more simply, section 9-207 deals with the use and operation of collateral in possession of a secured party *as collateral*. See 810 ILCS 5/9-102(12) (West 2018) (Collateral "means the property subject to a security interest or agricultural lien."). Section 9-207 applies to secured parties in possession of *collateral* either before or after default and permits "the secured party [to] use or operate the *collateral*" in certain ways. (Emphasis added.) *Id.* § 9-207(b)(4) ("(A) for the purpose of preserving the collateral or its value; (B) as permitted by an order of a court having competent jurisdiction[.]"). That is, the secured party who uses or operates any collateral in its possession continues to hold that collateral on behalf of the debtor as security for the underlying debt. Although the collateral may be leased, sold, or pledged as security in a different loan, it never ceases to be collateral owned by the debtor.

¶ 125       This is why section 9-207 explains how any proceeds from that use or operation of collateral must be handled by the secured party. Some of those provisions speak directly to possession of stock (*id.* § 9-207(c)); specifically, they permit the creditor in possession of stock to retain cash distributions or dividends as further collateral, decreasing the outstanding debt by the value of those retained funds (*id.*). What section 9-207(c) permits is for a party in possession to use the collateral to decrease and eventually eliminate the secured debt, at which point the collateral and any income generated by that collateral in excess of the debt must be delivered to the debtor. See *id.* (providing that a secured party in possession or control of investment property may hold proceeds received from the collateral as additional security, "shall apply money or funds received from the collateral to reduce the secured obligation, unless remitted to the debtor," and may repledge the collateral as security for a loan); see also *id.* § 9-207, UCC Comments 3, 5, and 6 (providing a detailed discussion and extensive examples of the meaning and operation of

subsection (c) investment property). See also *First American Bank v. Poplar Creek, LLC*, 2024 IL App (1st) 230551, ¶¶ 37-44 (explaining why it was commercially reasonable for the bank in that case to hold the TIF note, pledged as part of the collateral to secure the loan, and receive interest payments to reduce the outstanding debt rather than (1) accepting the note in full or partial satisfaction of the debt or (2) selling or otherwise disposing of the TIF note under section 9-610).

¶ 126      Quigg's section 9-207 argument is fundamentally at odds with the purpose of that provision because it seeks to transform the pledged stock from collateral for a loan into Quigg's personal property in satisfaction of that loan. Quigg has consistently asserted that the agreement allowed her to immediately vest in herself all of the rights to the pledged stock to the exclusion of any interest of Saleem. In short, she would have all the rights in the collateral, and Saleem would have none.

¶ 127      The correct interpretation of the parties' agreement is the same one that Quigg adopted in her June 16, 2022, notice of default. That notice provided that, if Saleem did not cure his default by July 18, 2022, Quigg would, "[i]n accordance with Paragraph 8 of the Quigg Pledge Agreement," exercise her right to "declare that all rights of the Pledgor pursuant to Paragraph 6 of the Quigg Pledge Agreement shall hereby immediately vest in the Pledgee." Section 8 provides,

> "[U]pon the occurrence of an Event of Default under this Agreement, all Obligations shall, at the election of the Pledgee, become immediately due and payable, without notice to the Pledgor, and all rights of the Pledgor in respect of the Collateral, *including all rights of the Pledgor under the terms of Section 6*, shall immediately vest in the Pledgee." (Emphasis added.)

¶ 128      Case law from around the country demonstrates that when shares of stock are pledged as collateral, the terms of the pledge agreement are a critical part of determining who may

exercise the ordinary rights of a shareholder, such as voting rights and dividends.

¶ 129    The general rule is that the pledgor of the stock has the right to vote the shares held until the shares are transferred into the name of the pledgee. 810 ILCS 5/7.45 (West 2018). However, the shareholder rights of stock pledged as collateral may be allocated by agreement of the parties. *In re LaRoche*, 969 F.2d 1299, 1303-04 (1st Cir. 1992) ("Pledges of investment securities routinely empower the secured creditor to transfer the pledged securities on the books of the issuing corporation as a means of enabling the secured creditor to collect dividends and vote the shares during the term of the loan. *Cf., e.g.*, *Raible v. Puerto Rico Indus. Dev. Co.*, 392 F.2d 424, 426 (1st Cir. 1968) (although secured creditor exceeded its voting authority under pledge agreement, provision permitting it to register pledged shares in its own name afforded creditor ordinary voting rights).").

¶ 130    Cases directly on point have explained that a creditor's exercising voting rights, acceptance of dividends, registering the shares in the creditor's name, and even pledging or assigning rights in the stock is typically permitted notwithstanding the fact that the creditor is not the owner of the shares. See *id.*; *Segovia v. Equities First Holdings, LLC*, C.A. No. 06C-09-149-JRS, 2008 WL 2251218, at *11 (Del. Super. Ct. May 30, 2008). Such actions do not necessarily demonstrate an intention to exercise ownership of the shares or to retain the pledged collateral stock in satisfaction of the debt. *Id.*

¶ 131    Here, the parties specifically agreed that Saleem would retain all voting rights in, and rights to dividends from, the shares of stock unless and until an event of default. In *Wisconics Engineering, Inc. v. Fisher*, 466 N.E.2d 745, 765-66 (Ind. Ct. App. 1984), the court examined whether the creditor was permitted to exercise voting rights when the security agreement provided only that the debtor retained voting rights until an event of default. The court held that the creditor

was permitted to exercise the ordinary rights incident to being a shareholder in possession of the stock in the absence of language to the contrary. *Id.* In *LaRoche*, 969 F.2d at 1304, the security agreement pertaining to the pledged shares of stock provided that the creditor, after default, could transfer the stock into its name and collect all dividends to hold as additional security. In *Segovia*, 2008 WL 2251218, at \*11, the agreement between the parties permitted the creditor to sell or otherwise encumber the collateral stock. And in *Cohen v. Rains*, 769 S.W.2d 380 (Tex. App. 1989), the court held that the creditor's exercise of voting rights in the shares the creditor possessed as collateral and taking control of the operations of the company was not an act of ownership where the security agreement provided that the debtor could exercise voting rights only until a default occurred. See also *Citibank, N.A. v. Data Lease Financial Corp.*, 828 F.2d 686, 697 (11th Cir. 1987) (stating that Citibank's exercise of voting rights in pledged collateral in its possession could have made it liable for damages to the debtor where Citibank exercised those rights to elect incompetent board members and managers of the company, which significantly harmed the value of the pledged stock).

¶ 132        Similarly, in this case, the pledge agreement expressly provides that Saleem reserves the bulk of his shareholder's rights in the pledged shares, unless and until an event of default. Section 8 then provides that, in the event of a default, at Quigg's election, she may exercise all of Saleem's rights, including those listed in section 6. That section reserves all of the rights of ownership to the stock in Saleem except for the ability to transfer, pledge, or encumber; the agreement does not contain an explicit restriction on Quigg regarding the ability to transfer, pledge, or encumber; however, the agreement does permit Quigg to place the shares in her own name on the books of the corporation, which suggests that, although Saleem could not exercise those rights, Quigg could. A reasonable, and perhaps the most common, interpretation of the plain language in

section 8 would be consistent with Quigg's position that "all rights of the Pledgor" means all of Saleem's rights, including ownership, are transferred upon an event of default. This reading is especially plausible in light of the subsequent phrase, "including all rights of the Pledgor under the terms of Section 6," because section 6 contains nearly all of the rights incident to ownership of stock.

¶ 133        However, the UCC explicitly forbids the automatic transfer of ownership in satisfaction of a debt without compliance with section 9-620. If we interpreted the provision to mean what Quigg suggests, we would essentially be required to not give that provision any effect because it violates the public policy codified in section 9-620. See *Schwalb*, 347 B.R. at 748 (holding, after reviewing and citing cases from around the country, that when a security agreement contains a provision that violates a nonwaivable provision of article 9, courts will enforce the agreement as if the offending provision did not exist). Given this context, Quigg's suggested interpretation is not the most reasonable. Instead, we can give effect to all of the language of section 8 if we interpret "all rights ***, including all rights *** under the terms of Section 6," as encompassing the rights in section 6 and the right to place in the holder's name, assign, and encumber. In short, we interpret section 8 as granting all rights in the stock except for the ultimate right of ownership, which amounts to essentially the unwaivable rights of a debtor listed in section 9-602 (redemption, notice of disposition, right to accounting, right to commercially reasonable sale or disposition, right to surplus proceeds, and right to damages for violations of article 9). This reading is entirely consistent with the rights listed in section 9-207(b) and also gives effect to Quigg's interpretation of section 8 as containing other rights to use and operate collateral in the creditor's possession by agreement of the parties pursuant to subsection (b)(4)(C).

¶ 134        5. *The Relevance of Section 9-207 to the Appropriate Remedy*

¶ 135    Although section 9-207 does not bar Saleem's counterclaim, it is still important to our disposition of this appeal. The trial court found that the intention of the parties was to permit Quigg to take operational control of QEI in the event of Saleem's default. Quigg alleged in her complaint that Saleem's actions were harming the value of her collateral and she needed to be placed in control of QEI to protect that value. The evidence presented at the preliminary injunction hearing unequivocally demonstrated that QEI was not running smoothly, mainly due to its cash flow problems that resulted from Saleem's breach of the line of credit with Bank of Springfield. Section 9-207 allows a party to use or operate collateral in any manner provided by court order, and courts analyzing section 9-207 have permitted secured parties in possession of shares of stock that were pledged as collateral to exercise the voting rights from those stocks to operate a company while preserving the stock's status as collateral. See *supra* ¶¶ 129-31.

¶ 136    As we earlier explained, section 8 of the pledge agreement can be read consistently with the antiwaiver provisions, so we interpret it in that manner under the presumption that contracting parties intend to comply with the law to the extent possible. Section 8 is best understood as authorizing specific rights for Quigg to use the collateral in a specified manner as provided for in section 9-207.

¶ 137    Based on the above reading, section 9-207 authorized the trial court to enter the relief sought by Quigg—namely, to be placed in charge of the company—but Quigg was merely using and operating the collateral stock *as collateral* and for the preservation of the collateral on behalf of Saleem, who continued to be the owner.

¶ 138    The parties agreed that pursuant to the sale documents, starting on January 1, 2019, Saleem was the sole owner of 100% of the shares of QEI and its president and CEO. The parties further agree that Saleem pledged the shares of stock as collateral and gave Quigg and Stocker

(1) physical possession of the stock certificates and (2) an independent assignment in blank of the shares back to Quigg and Stocker. The share pledge agreements contained the relevant terms governing the rights and interests the parties had in those shares of stock. Specifically, unless and until an event of default, Saleem was entitled to exercise all shareholder rights in the stock, except he could not assign, pledge, or encumber the stock. The pledge agreements dictated that Quigg and Stocker, as holders and possessors of the stock, had a mere security interest in the stock as security for the notes and were required to physically preserve the certificates. Quigg and Stocker were allowed to register the shares in their names. If an event of default occurred, Quigg and Stocker could elect to declare the entire indebtedness due and payable and immediately vest all of Saleem's rights, including those listed in section 6 of the pledge agreements, in Quigg and Stocker.

¶ 139          Based on the above, Saleem was entitled to control and operate QEI by voting 100% of the shares, unless and until (1) an "Event of Default," as defined in the pledge agreements, occurred and (2) Quigg and Stocker elected to accelerate the debt and vest in themselves Saleem's rights under section 6 of the pledge agreements. The trial court was not required to determine whether Quigg and Stocker were the owners of the stock in order to resolve the dispute and declare the respective rights of the parties under the terms of the sale documents.

¶ 140          Accordingly, we vacate the trial court's judgment that Quigg and Stocker were vested with ownership of the collateral stock. We further conclude that Saleem remains the legal owner of the collateral stock under the terms of the sale documents, without any of the rights in section 6, which have now vested in Quigg and Stocker, until Quigg and Stocker (1) properly sell or otherwise dispose of the collateral as provided in section 9-610, (2) properly seek to retain the stock in full satisfaction of the debt in compliance with section 9-620, or (3) exercise any other remedy consistent with the UCC and the pledge agreements. We make clear that nothing in this

order prevents the parties from entering into a settlement to resolve their respective claims by agreement.

¶ 141 By affirming the trial court's placing Quigg and Stocker in charge of QEI, we make no determinations about the effect of Quigg's and Stocker's exercising Saleem's rights to the collateral under section 6 of the pledge agreements on Saleem's counterclaim for damages or the amount of indebtedness remaining. That is, Saleem claims that he is entitled to the equity he had in QEI based on his payments and the increase in value of the company. On remand, Saleem may further pursue these claims, and Quigg and Stocker may assert any defenses or claims they may have in response.

¶ 142 E. A Declaratory Judgment Action Was Proper

¶ 143 Salem also argues that the trial court erred by not granting his motion for judgment on the pleadings because Quigg's complaint was not a proper declaratory judgment action and instead was, in fact, a claim for breach of contract. We disagree.

¶ 144 First, given that Saleem disputed both that he defaulted and that Quigg had the authority to take ownership of the collateral, this case is appropriate for a declaratory judgment. The parties are still governed by the purchase contract, and a dispute exists between the parties. Second, Saleem's counterclaim for breach of contract is sufficient to give the trial court jurisdiction to resolve Quigg's claims even if they are restyled as breach of contract. See *Brewer v. Allstate Life Insurance Co.*, 2022 IL App (1st) 210932-U, ¶ 33. In short, no reason exists to limit the trial court's ability to adjudicate the claims the parties have placed before it.

¶ 145 F. Motion for Leave To Amend

¶ 146 Saleem also argues that the trial court erred by denying his motion for leave to amend his counterclaims. Because we vacate the trial court's dismissal of Saleem's counterclaims,

we need not address whether the trial court erred by denying him leave to amend those claims. On remand, Saleem can seek leave to amend if he so desires, and the trial court can consider that motion in the normal course of proceedings.

¶ 147                                    G. Summation of Holdings

¶ 148          The trial court entered summary judgment in favor of Quigg on the issues of (1) Saleem's default under section 2(B) of the notes and (2) her ability to take ownership of the collateral in satisfaction of Saleem's debt. We conclude that summary judgment on the issue of Saleem's default was proper because no genuine issue of material fact exists that he defaulted on the Bank of Springfield line of credit, received proper notice of that default, and failed to cure it. We also conclude that the trial court did not err by granting Quigg the ability to exercise Saleem's voting rights in the collateral and operate QEI.

¶ 149          However, the trial court did err when it concluded that Quigg became the outright owner of the collateral without having to comply with section 9-620 of the UCC because the parties expressly provided for that remedy as part of the sale agreement. Because the UCC expressly prohibits parties from varying or waiving the provisions of section 9-620, we vacate the trial court's dismissal of Saleem's counterclaim and its entry of summary judgment in favor of Quigg to the extent that judgment held Quigg had accepted the collateral in satisfaction of the debt.

¶ 150          In short, we have affirmed the portions of the trial court's judgment that we deem correct, and any remaining findings of fact or determinations of law are vacated.

¶ 151          Although we remand the case for further proceedings, we make clear that (1) nothing in this order disturbs Quigg's current position as head of QEI and (2) we express no opinion on how the case should proceed on remand. That is, the trial court is free on remand to continue its order permitting Quigg and Stocker to operate QEI so as to preserve the value of the

collateral—namely, the 1000 shares of QEI stock owned by Saleem and in the possession and control of Quigg and Stocker to secure the loan. Further, we express no opinion on the ultimate outcome of the case, potential remedies, or courses of action with respect to the collateral. We emphasize that the parties may still avail themselves of the procedures provided in section 9-620 and nothing in this order or the UCC prevents them from negotiating a mutually agreeable resolution through a settlement agreement. Because such an agreement would be entered into after default, section 9-620 would authorize the waiver of its various provisions.

¶ 152                                   III. CONCLUSION

¶ 153          For the reasons stated, we affirm the trial court's entry of summary judgment in favor of Quigg on (1) Saleem's default under the sale documents based on his default on the Bank of Springfield line of credit and (2) Quigg's ability to control QEI, vacate all of the trial court's other findings and judgments, and remand for further proceedings not inconsistent with this order.

¶ 154          Affirmed in part, vacated in part, and remanded for proceedings not inconsistent with this order.